IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUXCO, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14 C 0349 |
| v. ) | |
| ) | |
| JIM BEAM BRANDS, CO., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On April 21, 2014, Plaintiff Luxco, Inc. ("Luxco") filed a two-count First Amended Complaint alleging breach of contract claims involving express warranties set forth in the January 2013 Asset Purchase Agreement ("APA") with Defendant Jim Beam Brands, Co. ("Beam") pursuant to the Court's diversity jurisdiction.[1]  *See* 28 U.S.C. § 1332.  On October 2, 2014, Beam filed a breach of contract Counterclaim in relation to the parties' Transition Services Agreement ("TSA").  Before the Court is Beam's motion for summary judgment as to Luxco's two breach of contract claims and its breach of contract counterclaim brought pursuant to Federal Rule of Civil Procedure 56(a) and Northern District of Illinois Local Rule 56.1.  For the following reasons, the Court grants in part and denies in part Beam's summary judgment motion.  Specifically, the Court grants Beam's motion regarding Count II of the First Amended Complaint, but denies Beam's motion as to Count I and Beam's Counterclaim.  In addition,

---

[1] Luxco is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at 1000 Clark Avenue, St. Louis, Missouri.  Beam is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 510 Lake Cook Road, Deerfield, Illinois.  (R. 24, First Am. Compl. ¶¶ 2, 3.) Luxco alleges that the amount in controversy exceeds $75,000.  (*Id*. ¶ 4.)

because the Court did not address Beam's arguments made for the first time in its reply brief, including undeveloped arguments made in footnotes, the Court denies Luxco's motion to strike as moot. *See United States v. Lacy*, 813 F.3d 654, 658 (7th Cir. 2016) (arguments made for the first time in a reply brief are waived); *see also Harmon v. Gordon,* 712 F.3d 1044, 1053 (7th Cir. 2013) ("[A] party can waive an argument by presenting it only in an undeveloped footnote.").

## BACKGROUND[2]

### I. Introduction

Beam is an Illinois-based producer and bottler of alcoholic beverage products. (R. 92, Def.'s Rule 56.1 Stmt. Facts ¶ 1.) Beam's products are sold to a nationwide network of independent distributors, who contract with hundreds of retailers throughout the country. (*Id*. ¶ 2.) Luxco, which was founded in 1958 and is based in St. Louis, Missouri, is also one of the nation's leading beverage alcohol companies. (*Id*. ¶ 3.)

In March 2012, Beam and Luxco began discussing Beam's potential sale to Luxco of the exclusive right to sell thirteen of its brands of alcoholic beverages, including Bellows Blended, Bellows Bourbon, Bellows Gin, Bellows Light Rum, Bellows Scotch, Bellows Vodka, Calvert Extra, Calvert Gin, Canada House Canadian, Dark Eyes Vodka, Lord Calvert Canadian, Tempo Triple Sec, and Wolfschmidt Vodka ("Acquired Brands"). (*Id.* ¶ 6.) John Lee, Beam's Vice President of Strategy (North America), testified that the Acquired Brands were part of what

---

[2] Although the parties filed numerous documents under seal, the Seventh Circuit has held that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht,* 622 F.3d 697, 701 (7th Cir. 2010); *see also United States v. Foster,* 564 F.3d 852, 853 (7th Cir. 2009) (sealed documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

Beam referred to colloquially as its "tail brands," "economy brands" or "value category," meaning brands that resulted in a "lower profit margin" for Beam than its more lucrative premium brands. (*Id*. ¶ 7.) Beam's Senior Vice President and Chief Strategy Officer testified that by selling the Acquired Brands, Beam sought to increase its growth and refocus on its premium brands. (*Id*. ¶ 8.) To that end, on January 18, 2013, Luxco and Beam executed the relevant APA under which Luxco would acquire the exclusive right to sell the Acquired Brands. (*Id*. ¶ 9.) On January 31, 2013, the parties closed on the transaction. (Pl.'s Stmt. Facts ¶ 90.)

## II. Support for Marketing and Distribution of the Acquired Brands

During the initial due diligence period, Luxco's Chief Executive Officer Donn Lux e-mailed a list of requests to Lee – as well as to Beam's Senior Director for North American Strategy and Revenue Management Brendan Lynch – requesting information about the "Annual Marketing Spend by Brand" and a "List of programs, pricing promotions, free goods and entity grants by state (distributor) costs by year." (R. 104, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶ 77.) Specifically, Beam uses entity grants and local marketing funds ("LMF") as incentive programs to support marketing and distribution of its brands. (Def.'s Stmt. Facts ¶ 19.) Beam and some of its distributors, for example, pay LMF funds for local advertising, merchandising materials, and price support to retailers. (*Id*. ¶ 26.) Luxco presents evidence that it was not until after the execution of the parties' APA that it discovered Beam was financing its distributors to use the Acquired Brands as free goods to induce sales of Beam's other brands. (Pl.'s Stmt. Facts ¶¶ 95, 97, 109.)

Likewise, before the execution of the APA, Beam provided credits to distributors to maintain sales of Wolfschmidt vodka products in Florida and Arizona in 2012. (Pl.'s Stmt. Facts

3

¶ 110.) In particular, it is undisputed that Beam agreed to provide its distributors with credits against Beam's annual sales targets in those two states. (*Id*.) Further, Luxco sets forth evidence, albeit disputed, that without the Wolfschmidt credits, sales of Wolfschmidt vodka products would have significantly declined during 2012. (*Id*. ¶ 111.)

### III. Reformulation of Economy Vodka Brands and Market Response

Beginning in April 2012, Beam decided to reformulate certain "economy" or "tail" vodka brands, including Wolfschmidt, Dark Eyes, and Bellows, by converting the straight vodka products into vodka liqueur products. (Def.'s Stmt. Facts ¶¶ 37, 42.) Thereafter, Lux e-mailed Lee and Lynch requesting the consumer and market research upon which Beam relied in deciding to reformulate its straight vodka products. (Pl.'s Stmt. Facts ¶ 78.) Lux specifically stated: "We are concerned about the potential volume impact on such a dramatic change." (*Id.*) Luxco sets forth evidence that on April 26, 2012, Jared Fix, Beam's Vice President of Cordials and Regional Brands, e-mailed Lux information regarding Beam's research showing positive consumer reaction to label changes for vodkas that Beam planned to reformulate. (*Id*. ¶ 116.) Nonetheless, Luxco was concerned about the vodka reformulation, and in December 2012, Luxco submitted additional due diligence inquiries focusing on the market's response to the vodka reformulation. (*Id.* ¶ 86.) Beam responded that it would provide answers in a commercial call between the parties on December 18, 2012. (*Id.*)

In response to Luxco's inquiries on the market response to the reformulated vodka, Kevin Cooke, Beam's Vice President of Sales Strategy for North America, told his Beam colleagues that Luxco had "a lot of questions deserving detailed answers." (*Id*. ¶ 87.) Also in response to Luxco's inquiries, Lynch informed his Beam colleagues that "I don't want to give

4

them everything on [their] list," and that he would develop responses that did not "answer the granular details" to Luxco's questions.[3] (*Id.* ¶ 88.) Thereafter, Lynch and Lee participated in the December 18, 2012 commercial call with Luxco's Chief Operating Officer David Bratcher and Luxco's Vice President of Sales and Marketing Dan Streepy. (*Id.*) During the December 18, 2012 commercial call, Beam represented that Publix Supermarket's termination of Wolfschmidt vodka liqueur was related to the pricing of the reformulated vodka and that price was the driving factor on chain store declines in Florida and Arizona. (*Id.* ¶ 89.) Also during the December 2012 commercial call, Beam told Luxco that it had received 75 complaints from consumers and retailers regarding the reformulated vodka. (*Id.* ¶ 90; Def.'s Stmt. Facts ¶ 50.) In addition, Luxco offers evidence that during the ten-day due diligence period between the public announcement of the APA on January 21, 2013 and the closing date of January 31, 2013, certain distributors informed Luxco about the negative market reaction to the reformulated vodka products. (Pl.'s Stmt. Facts ¶ 100.)

## IV. Negotiation of the Terms of Asset Purchase Agreement

On November 1, 2012, Luxco and Beam met at Beam's Illinois office where the parties outlined the draft of the APA. (*Id.* ¶ 80.) Shortly thereafter, on November 12, 2012, as part of a letter of intent, Beam provided Luxco with a Brand Detail Sheet that reported by brand the total Shipment Cases, Net Sales, Gross Profit, Brand Investment, and Brand Contribution for 2009 through 2011, as well as the Trailing Twelve Month Period ending October 31, 2012 ("TTM

---

[3] Luxco presents evidence regarding Lynch's prepared responses to Luxco's inquiries for the December 18, 2012 commercial call, but does not point to evidence in the record that the parties actually discussed these prepared responses at the December 2012 call. (Pl.'s Stmt. Facts ¶ 88.)

October 2012"). (*Id.* ¶ 81.) In response, on November 18, 2012, Lux e-mailed a Term Sheet, Due Diligence & Closing Checklist and the Brand Detail Sheet provided by Beam six days earlier, which recited the tentative terms of the deal. (*Id.* ¶ 83.) Luxco's November 18, 2012 Due Diligence and Closing Checklist included a request for copies of Beam's Distributor Agreements, which Beam did not turnover ostensibly due to the parties March 2012 Non-Disclosure Agreement. (*Id.* ¶¶ 79, 84.) Furthermore, Luxco requested that Beam identify its "retail account incentives/programs by brand by retailer and distributor," to which Beam responded "No incentives or BI [Brand Incentive] dollars go toward the tail brands." (*Id.* ¶ 84.)

**V.   Asset Purchase Agreement**

Luxco and Beam executed the relevant APA on January 18, 2013, pursuant to which Luxco would acquire from Beam the exclusive right to sell the Acquired Brands. (Def.'s Stmt. Facts ¶ 9.) As part of the APA negotiations, Luxco bargained for and purchased representations and warranties from Beam regarding the Acquired Brands. (Pl.'s Stmt. Facts ¶ 91.) More specifically, Luxco bargained for and purchased the representations and warranty in Section 3.14 of the APA, which states:

> **Brand Detail Sheet**.  The Brand Detail Sheet provided by the Seller to the Purchaser attached as <u>Schedule 3.14</u> is true, complete and accurate in all material respects.

(*Id.* ¶ 10c; Pl.'s Stmt. Facts ¶ 91.) Schedule 3.14 entitled "Brand Detail Sheet" is a spreadsheet that lists the shipped cases and net sales for the years 2009 through 2011 and TTM October 2012 for all of the Acquired Brands. (Def.'s Stmt. Facts ¶¶ 12, 13.) It is undisputed that the parties relied upon the "Brand Detail Sheet" during their contract negotiations. (Pl.'s Stmt. Facts ¶ 93.)

6

Luxco also bargained for and purchased the representations and warranty in Section 3.13 of the APA, which states:

> "**Ordinary Course After Signing**. From November 16, 2012 [until the closing of the transaction on January 31, 2013], the Seller has conducted its business in the ordinary course, consistent with the Seller's past practices, and there has been no Material Adverse Effect."

(*Id*. ¶ 10a; Pl.'s Stmt. Facts ¶ 92.) Section 9.1 of the APA defines "Material Adverse Effect" as follows:

> [A]ny change, effect, event, occurrence or state of facts that, taken individually or together with all other changes, effects, occurrence or state of facts, would be materially adverse to the operations, results of operation or condition (financial or otherwise) of the business of the Seller related to the sale of the Products or the brands related to the Products, in each case, taken as a whole[.]

(*Id*. ¶ 10b; R. 96-1, Ex. 1, APA § 9.1.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine

7

issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "To survive summary judgment, the non-moving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Life Plans, Inc. v. Security Life of Denver Ins. Co.,* 800 F.3d 343, 349 (7th Cir. 2015).

## ANALYSIS

New York law governs their parties' breach of contract claims pursuant to the governing law provisions of the APA and the TSA. "Under New York law, an express warranty is part and parcel of the contract containing it and an action for its breach is grounded in contract." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007); *see also CBS Inc. v. Ziff-Davis Pub. Co.,* 75 N.Y.2d 496, 503, 553 N.E.2d 997, 554 N.Y.S.2d 449 (1990) ("The express warranty is as much a part of the contract as any other term."). When construing a contract under New York law, a court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, 773 F.3d 110, 113 (2d Cir. 2014) (citation omitted). "[T]he words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.,* 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted). "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *Chesapeake Energy Corp.*, 773 F.3d at 114 (quoting *Howard v. Howard,* 292 A.D.2d 345, 740 N.Y.S.2d 71, 71 (N.Y. App. Div. 2002)). "Ambiguity exists only if a contract term 'is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *In re*

8

*Lehman Bros. Holdings Inc.,* 761 F.3d 303, 309 (2d Cir. 2014) (citation omitted). If contract terms are ambiguous, courts may consider "extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Trust Co. v. Franklin Advisers, Inc.,* 726 F.3d 269, 276 (2d Cir. 2013) (citation omitted).

**I.     Breach of the APA Section 3.14 – Count I**

In Count I of the First Amended Complaint, Luxco alleges that Beam breached the express warranty in Section 3.14, which specifically states: "The Brand Detail Sheet provided by the Seller to the Purchaser attached as Schedule 3.14 is true, complete and accurate in all material respects." In particular, Luxco argues that Beam breached Section 3.14 because Schedule 3.14 provides inaccurate and incomplete shipment and net sales figures as a result of Beam's use of LMF price supports for free goods programs, brand discounts, and other support programs that "propped up" the sales figures and shipped case numbers. Additionally, Luxco contends that Beam used credits to artificially inflate the number of shipped cases and net sales in Arizona and Florida in relation to Wolfschmidt vodka products and that Beam did not disclose that the Wolfschmidt credits inflated reported shipments and net sales for TTM October 2012.

On the contrary, Beam argues that the express warranty in Section 3.14 does not include any warranties in relation to its incentive or marketing programs that affect the Acquired Brands, but rather is limited to the historical financial data as reflected in Schedule 3.14. In essence, Beam contends that when giving full meaning and effect to all of the APA's provisions, it contains no express warranties as to its incentive or marketing programs, especially considering the APA's express disclaimer of all other warranties in Section 3.20 and the APA's merger and integration clause set forth in Section 10.6. Luxco, however, is not arguing that Section 3.14

9

expressly warrants Beam's factual representations made in relation to its use of incentive and marketing support programs. Instead, the Court's focus is whether Beam breached the express warranty because Schedule 3.14 did not reflect LMF price supports and other incentives resulting in inaccurate and incomplete figures. Put differently, Luxco is challenging the accuracy and completeness of the net sales figures and shipment amounts – the exact subject matter of the express warranty in Section 3.14 and Schedule 3.14.

Turning to the evidence presented at summary judgment, according to Beam, the incentive and marketing programs at issue were accurately reflected in Schedule 3.14. Beam specifically asserts that it did not pay the LMF funds at issue, thus any such funds would not be reflected in Schedule 3.14 in the first instance. Beam points to evidence in the record that three of its distributors were contractually required to pay LMF funds – not Beam. Also, Beam asserts that, in general, LMFs are generated from a distributor's gross margin and reflected in the distributor's profit and loss statements. Construing this evidence and all reasonable inferences in Luxco's favor – as the Court is required to do at this procedural posture – the fact that three of Beam's distributors were contractually required to pay LMF funds does not establish that all of Beam's distributors paid the LMF funds related to Schedule 3.14. In further support of its argument, Beam highlights Lee's deposition testimony for the proposition that LMFs are not reflected in Beam's profit and loss statement upon which Beam relied to draft Schedule 3.14. This testimony, however, does not unequivocally establish that the LMF funds and incentives at issue were not reflected in Beam's profit and loss statements because the highlighted deposition testimony speaks to the impact of these funds in a more general sense. (R. 93-2, Ex. 2, Lee Dep., at 37-38.) Meanwhile, Beam does not specifically explain how the Wolfschmidt credits were

accurately reported in Schedule 3.14.  Under the circumstances, Beam has failed in its burden of establishing that there is no genuine dispute as to any material fact regarding Luxco's breach of warranty claim.  *See Celotex Corp.,* 477 U.S. at 323.

Additionally, construing the facts and all reasonable inferences in Luxco's favor, Luxco has offered evidence raising triable issues of material fact that without the Wolfschmidt credits, the sales of Wolfschmidt vodka products would have significantly declined during 2012 – calling into question whether Schedule 3.14 was accurate in this respect.  (Pl.'s Stmt. Fact ¶¶ 110-113.) Luxco also presents evidence, when viewed in its favor, that Beam's use of free goods, LMFs, and Wolfschmidt credits directly impacted both the shipped cases and net sales reported in Schedule 3.14.  (*Id*. ¶¶ 106, 115.)  Luxco specifically offers evidence that after meeting with Beam's distributors, it determined that over $530,000 in "free goods" had subsidized approximately 110,000 cases of alcohol  (*Id*. ¶¶ 96, 107, 108.)  Consequently, there are issues of material fact for trial whether Beam breached the express warranty in Section 3.14.

Nevertheless, Beam argues that Luxco cannot enforce the express warranty in Section 3.14 because Luxco was aware that Beam used incentive and marketing programs prior to the closing of the transaction.  Under New York law, an express warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely" and "is intended precisely to relieve the promisee of any duty to ascertain the fact for himself."  *Ziff-Davis,* 75 N.Y.2d at 503 (citation omitted).  Accordingly, the critical question in the context of express warranties is not whether the buyer believed the truth of the warranted information, but whether the buyer believed it was purchasing the seller's promise as to the truth of the information.  *See id*.; *see also Merrill Lynch,* 500 F.3d at 186; *Powers v. Stanley Black &*

11

*Decker, Inc.,* 137 F. Supp. 3d 358, 375 (S.D.N.Y. 2015). Thus, "the general rule is that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue." *Merrill Lynch,* 500 F.3d at 186.

Examining the facts in Luxco's favor, the express warranty in Section 3.14 was a bargained-for contractual term in which Luxco bought Beam's representation that the shipped cases and net sales stated in Schedule 3.14 were accurate and complete. *See Merill Lynch,* 500 F.3d at 186; *Ziff-Davis*, 75 N.Y.2d at 506 n.5; *see also Metromedia Co. v. Fugazy,* 983 F.2d 350, 360 (2d Cir. 1992)*, abrogated on other grounds by Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Luxco has also set forth evidence creating a triable issue of fact that it relied on the bargained-for express warranty in Section 3.14 by committing itself to buying the exclusive right to sell the Acquired Brands, especially in light of the March 2012 Non-Disclosure Agreement limiting Luxco's access to information regarding Beam's distributors. (Pl.'s Stmt. Facts ¶¶ 102, 113.) *See Ziff-Davis*, 75 N.Y.2d at 505. As such, Beam's argument fails at this juncture.

Because Luxco has presented evidence raising issues of material fact for trial that Beam breached the express warranty in Section 3.14 by failing to provide accurate and complete information regarding the shipped cases and net sales for the years 2009 through 2011 and TTM October 2012 for the Acquired Brands, the Court denies Beam's summary judgment motion as to Count I of the First Amended Complaint.

## II.     Breach of the APA Section 3.13 – Count II

In Count II of the First Amended Complaint, Luxco alleges that Beam breached the express warranty in Section 3.13, which warranted that no "material adverse effect" had

12

occurred from November 16, 2012 until the transaction's closing on January 31, 2013. Luxco specifically argues that the market's rejection of the reformulated vodka liqueur and its reverberating effects throughout and beyond the warranty period constituted a material adverse effect. Section 3.13, entitled "Ordinary Course After Signing," states that "From November 16, 2012, the Seller has conducted its business in the ordinary course, consistent with the Seller's past practices, and there has been no Material Adverse Effect." The APA defines "Material Adverse Effect" in relevant part:

> [A]ny change, effect, event, occurrence or state of facts that, taken individually or together with all other changes, effects, occurrence or state of facts, would be materially adverse to the operations, results of operation or condition (financial or otherwise) of the business of the Seller related to the sale of the Products or the brands related to the Products, in each case, taken as a whole.

Neither party argues that the APA's material adverse effect clause or definition is ambiguous. Thus, the Court turns to the APA's broad language in relation to the "material adverse effect" clause, and decisions in which courts have applied New York law under similar circumstances. *See, e.g., In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 67 (Del. Ch. 2001). In *In re IBP, Inc. S'holders Litig.*, for example, after a bench trial, the Delaware Chancery Court stated:

> Where a Material Adverse Effect condition is as broadly written as the one in the Merger Agreement, that provision is best read as a backstop protecting the acquiror from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner. A short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquiror.

*Id.* at 68; *see also Liberty Media Corp. v. Vivendi Universal, S.A.,* 874 F. Supp. 2d 169, 176 (S.D.N.Y. 2012) (material adverse change ("MAC") clause protects against unknown risks);

13

*Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F. Supp. 2d 23, 30 (D.D.C. 2009) ("parties often include MAC clauses to protect against unknown, not known, events."). Further, in an appeal from a bankruptcy court decision, a Southern District of New York bankruptcy judge reasoned that the "material and adverse change clause ... must be limited to events that were outside the contemplation of the parties at the time of the transaction." *In re JC's E., Inc.*, No. 95 CIV. 1870 (MGC), 1995 WL 555765, at *3 (Bankr. S.D.N.Y. Sept. 19, 1995). Courts relying on New York law have also concluded that the burden of proof with respect to a material adverse effect clause rests on the party seeking to invoke the clause and that a "buyer faces a heavy burden when it attempts to invoke a material adverse effect clause." *Hexion Specialty Chem., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738-39 (Del. Ch. 2008). Here, the parties generally agree that the Court's relevant inquiry involves three factors: (1) whether the alleged material adverse effect was known to Luxco; (2) whether the alleged material adverse effect substantially threatened the overall earnings potential of the acquired assets; and (3) whether the alleged material adverse effect was durationally-significant. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d at 68.

The Court turns to whether the market's rejection of the reformulated vodka products was known to Luxco during the relevant time period because it is dispositive. As discussed, there is undisputed evidence in the record that Luxco was aware of and had concerns about the reformulation of Beam's straight vodka products during the due diligence and warranty periods. (Pl.'s Stmt. Facts ¶¶ 78, 80; Def.'s Stmt. Facts ¶¶ 46, 47, 49.) More specifically, there is undisputed evidence that Luxco was concerned about the market's response to the vodka liqueur reformation in December 2012 when Luxco submitted its additional due diligence inquiries

14

about the market's response that the parties discussed at the December 18, 2012 commercial call. (Pl.'s Stmt. Facts ¶ 86.) It is also undisputed that Beam informed Luxco that it had received complaints from consumers and retailers regarding the reformulated vodka during the December 2012 commercial call. (*Id.* ¶ 90; Def.'s Stmt. Facts ¶ 50.) Similarly, Luxco offers evidence that during the ten-day due diligence period between the public announcement of the APA and the closing date, several distributors informed Luxco about the negative market reaction to the reformulated vodka products. (Pl.'s Stmt. Facts ¶ 100.) Moreover, Luxco's Vice President of Sales and Marketing Dan Streepy testified at his deposition that based upon conversations with Beam and data received from Beam prior to closing, he had concluded that Wolfschmidt reformulated vodka liqueur had been hit the hardest in terms of consumer complaints. (Def.'s Stmt. Facts ¶ 51.) Streepy further testified that on January 8, 2013, he had communicated this information to Lux and Bratcher. (*Id.*, Ex. 10, Streepy Dep., at 190.) Also prior to closing, Streepy noted that the biggest issue with the transaction was the impact of the conversion to vodka liqueur and that "the volume decline will be difficult to stop unless we can appease the [retail] chains." (*Id.* ¶ 51.) There is also undisputed evidence that during the initial due diligence period, Luxco's COO Bratcher emailed Luxco's CEO stating that the "formulation change is pretty scary" and "may be risky." (*Id.* ¶ 49.) Further, Luxco does not dispute that prior to closing, Beam provided Luxco with sales data current through December 2012 and that this data reflected a downward trend in sales volume for some of the reformulated vodka brands. (*Id.* ¶ 52.)

Based on this undisputed evidence viewed in Luxco's favor, Luxco was aware of the downward sales trend in relation to the vodka reformulation during the warranty period, as well

15

as consumer, retailer, and distributor complaints regarding the vodka reformulation during the relevant time period. In fact, prior to the January 2013 closing, Luxco's Streepy admitted that the biggest issue with the transaction was the impact of the conversion to vodka liqueur. As such, Luxco's argument that Beam did not disclose the market's negative reaction to the vodka reformulation is unavailing. Moreover, construing the evidence and all reasonable inferences in Luxco's favor, even if Beam did not disclose the "granular details" of the market's rejection concerning the reformulated vodka products at the December 18, 2012 commercial call, any inference that Luxco did not know about the market's rejection – including consumer, distributor, and retailer complaints – is unreasonable in light of the undisputed facts. *See Cung Hnin v. TOA (USA), LLC,* 751 F.3d 499, 508 (7th Cir. 2014) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (citation omitted).

Because undisputed evidence indicates that Luxco had knowledge of the market's rejection of the reformulated vodka products during the warranty and due diligence periods, Luxco has failed to present sufficient evidence to establish "every element that is essential to its claim and for which it will bear the burden of proof at trial." *See Life Plans, Inc.,* 800 F.3d at 349. The Court therefore grants Beam's summary judgment motion as to Count II of the First Amended Complaint.

### III.  Breach of the Transition Services Agreement – Counterclaim I

On October 2, 2014, Beam filed a breach of contract counterclaim in relation to the parties' TSA. Pursuant to Section 2.2 of the APA, Beam and Luxco entered into the TSA on February 1, 2013, and the parties amended the TSA on April 1, 2013. (Def.'s Stmt. Facts ¶¶ 65, 66.) Under the TSA, Beam agreed – for a period of one year following the closing – to "process,

16

bottle, store, and ship" certain Acquired Brands for Luxco. (*Id.* ¶ 67.) With respect to the Acquired Brands that Beam had reformulated, the TSA stated that Luxco could reverse the reformulation and require Beam to produce and provide the original straight vodka formulation for those brands. (*Id.* ¶ 68.) In fact, after the January 2013 closing, Luxco switched from some of the reformulated vodka brands back to the original straight vodka formulation. (*Id.* ¶ 69.)

Under the TSA, the parties agreed that Beam would deliver to Luxco a "True-Up Schedule" setting forth the actual volume of each product that Luxco purchased during the term of the TSA compared to the agreed-upon target volume for each product. (*Id.* ¶ 70.) If the actual volume exceeded the target volume, Beam would pay Luxco a "True-Up Amount," whereas if the target volume exceeded the actual volume, Luxco would pay Beam a "True-Up Amount." (*Id.* ¶ 71.)

In a letter dated February 10, 2014, Beam provided Luxco with the contemplated "True-Up Schedule," and informed Luxco that the "true-up schedule shows a net amount payable by Luxco to Beam of $393,215." (*Id.* ¶ 73.) In the February 10, 2014 letter, Beam requested that Luxco "confirm that [it] does not dispute the calculation," which, Beam noted, would "be deemed final," under the terms of the TSA, "if Beam does not receive notice of any dispute from Luxco by March 10, 2014." (*Id.* ¶ 74.) Luxco responded on February 28, 2014 stating that it "agrees that Beam has stated the correct number of cases of product purchased by Luxco from Beam over the stated period, and that, pursuant to the terms of the TSA, Beam has correctly calculated the amount purported[ly] owed by Luxco to Beam thereunder." (*Id.* ¶ 75.) Luxco, however, has not paid the amount due under the TSA asserting that it is entitled to "set off" that

amount against the prospective judgment that it seeks in this action based on Beam's breach of the APA. (*Id.* ¶ 76.)

Indeed, in response to the present summary judgment motion, Luxco argues that Beam's breach of the express warranties in the APA excuses Luxco's performance under the TSA because the contracts should be construed together. In essence, Luxco argues that it need not pay the amount due under the TSA because "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch,* 500 F.3d at 186. Beam, on the other hand, argues that the TSA is a separate contract from the APA, and therefore, Luxco is not excused from its obligation to perform under the TSA.

Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." *TVT Records v. Island Def Jam Music Grp.,* 412 F.3d 82, 89 (2d Cir. 2005) (quoting *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir. 1998)); *see also Brax Capital Grp., LLC v. WinWin Gaming, Inc.,* 83 A.D.3d 591, 592 (N.Y. App. Div. 2011) ("documents executed at about the same time and covering the same subject matter are to be interpreted together, even if one does not incorporate the terms of the other by reference, and even if they are not executed on the same date, so long as they are 'substantially' contemporaneous."). "'Whether multiple writings should be construed as one agreement depends upon the intent of the parties,' an issue which is typically a question of fact for the jury." *TVT Records,* 412 F.3d at 89 (citation omitted).

Here, Luxco has set forth evidence that the TSA was attached as an exhibit to the

APA and that it was executed on February 1, 2013, which is one day after the APA closed. (Pl.'s Stmt. Facts ¶ 130.) In addition, Exhibit 2 of the TSA set a target volume of Acquired Brands cases to be produced by Beam in the year following the APA's closing date based upon the Brand Detail Sheet and the APA's Schedule 3.14. (*Id*.) It is also undisputed that Beam and Luxco entered into the TSA pursuant to Section 2.2 of the APA. (Def.'s Stmt. Facts ¶¶ 65, 66.)

Viewing these facts and all reasonable inferences in Luxco's favor, Luxco has offered evidence raising a genuine issue of material fact for trial whether the parties intended that the APA and TSA should be construed together. Therefore, the Court denies Beam's summary judgment motion in relation to its breach of contract counterclaim.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant's Rule 56(a) motion for summary judgment.

**Dated:** June 6, 2016

            **ENTERED**

            _____
            **AMY J. ST. EVE**
            **United States District Court Judge**