**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LUXCO, INC., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) Case No. 14 C 0349 |
| v. | ) |
| | ) |
| JIM BEAM BRANDS CO., | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On July 7, 2016, Defendant/Counter-Plaintiff Jim Beam Brands, Co. ("Beam") moved to strike Plaintiff/Counter-Defendant Luxco, Inc.'s ("Luxco") damages expert David Bratcher pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Prior to Beam filing the present *Daubert* motion, the Court granted in part and denied in part Beam's motion for summary judgment on June 6, 2016, and, on June 9, 2016, the Court set the bench trial date for November 28, 2016. The Court presumes familiarity with its June 6, 2016 summary judgment ruling. For the following reasons, the Court, in its discretion, grants in part and denies in part Beam's motion.

**BACKGROUND**

**I.      Factual Background**

   **A.      Introduction**

Beam is an Illinois-based producer and bottler of alcoholic beverages. Beam sells its products to nationwide network of independent distributors, who contract with hundreds of retailers throughout the country. Luxco, which is based in St. Louis, Missouri, is also one of the

nation's leading beverage alcohol companies. In March 2012, Beam and Luxco began discussing Beam's potential sale to Luxco of the exclusive right to sell thirteen of its brands of alcoholic beverages, including Bellows Blended, Bellows Bourbon, Bellows Gin, Bellows Light Rum, Bellows Scotch, Bellows Vodka, Calvert Extra, Calvert Gin, Canada House Canadian, Dark Eyes Vodka, Lord Calvert Canadian, Tempo Triple Sec, and Wolfschmidt Vodka (the "Acquired Brands"). On January 18, 2013, Luxco and Beam executed the relevant Asset Purchase Agreement ("APA"). On January 31, 2013, the parties closed on the transaction.

B. Price Supports

During the initial due diligence period, Luxco's Chief Executive Officer Donn Lux emailed a list of requests to Beam's Vice President of North American Strategy, John Lee, and Beam's Senior Director for North American Strategy and Revenue Management, Brendan Lynch, requesting information about the "Annual Marketing Spend by Brand" and a "List of programs, pricing promotions, free goods and entity grants by state (distributor) costs by year." Beam uses entity grants and local marketing funds ("LMF") as incentive programs to support marketing and distribution of its brands. Beam and some of its distributors, for example, pay LMF funds for local advertising, merchandising materials, and price support to retailers. At summary judgment, Luxco presented evidence that it was not until after the execution of the parties' APA that it discovered Beam was financing its distributors to use the Acquired Brands as free goods in order to induce sales of Beam's other brands.

Likewise, before the execution of the APA, Beam provided credits to distributors to maintain sales of Wolfschmidt vodka in Florida and Arizona in 2012. In particular, Beam agreed to provide its distributors with credits against Beam's annual sales targets in those two states. At

2

summary judgment, Luxco presented evidence that without the Wolfschmidt credits, sales of Wolfschmidt vodka would have significantly declined during 2012.

### C. Negotiation of the Terms of the Asset Purchase Agreement

On November 1, 2012, Luxco and Beam met at Beam's Illinois office where the parties outlined the draft of the APA. Shortly thereafter, on November 12, 2012, as part of a letter of intent, Beam provided Luxco with a Brand Detail Sheet that reported by brand the total shipment cases, net sales, gross profit, brand investment, and brand contribution for 2009 through 2011, as well as the trailing twelve month period ending October 31, 2012 ("TTM October 2012"). On November 18, 2012, Luxco e-mailed a Term Sheet, Due Diligence & Closing Checklist, and the Brand Detail Sheet provided by Beam six days earlier, which recited the tentative terms of the deal. Luxco's November 18, 2012 Due Diligence and Closing Checklist included a request for copies of Beam's Distributor Agreements, which Beam did not turnover. Also, Luxco requested that Beam identify its "retail account incentives/programs by brand by retailer and distributor," to which Beam responded "No incentives or BI [Brand Incentive] dollars go toward the [Acquired Brands]."

### D. Asset Purchase Agreement

Luxco and Beam executed the relevant APA on January 18, 2013, pursuant to which Luxco would acquire from Beam the exclusive right to sell the Acquired Brands. As part of the APA negotiations, Luxco bargained for and purchased representations and warranties from Beam regarding the Acquired Brands. Relevant to this lawsuit, Luxco bargained for and purchased the representations and warranty in Section 3.14 of the APA, which states:

> **Brand Detail Sheet**. The Brand Detail Sheet provided by the Seller to the Purchaser attached as Schedule 3.14 is true, complete and accurate in all material

respects.

Schedule 3.14 entitled "Brand Detail Sheet" is a spreadsheet that lists the shipped cases and net sales for the years 2009 through 2011 and TTM October 2012 for all of the Acquired Brands. It is undisputed that the parties relied upon the "Brand Detail Sheet" during their contract negotiations.

    **E.**    **Remaining Claims**

Luxco's damages expert, David Bratcher, offers expert opinions regarding Count I of the Luxco's First Amended Complaint. In Count I, Luxco alleges that Beam breached the express warranty in Section 3.14 because Schedule 3.14 provides inaccurate and incomplete shipment and net sales figures as a result of Beam's use of LMF price supports for free goods programs, brand discounts, and other support programs that propped up the sales figures and shipped case numbers. Bratcher also opines as to the parties' Transaction Services Agreement ("TSA"), which is the subject of Beam's breach of contract Counterclaim.

**II.**    **Bratcher's Qualifications**

Bratcher has 21 years of work experience in the wine and spirits industry and is Luxco's President and Chief Operating Officer. Bratcher holds a Bachelor of Science Degree in Business Administration and Management from the College of the Ozarks in Point Lookout, Missouri, as well as Masters and Doctorate Degrees in Management from Webster University in Webster Groves, Missouri.

As part of his job duties as President and Chief Operating Officer, Bratcher has become acquainted with liquor brand acquisitions and sales and has personally analyzed and evaluated approximately 50 potential liquor brand acquisitions or sales on behalf of Luxco. Furthermore,

4

he has closed on 13 separate liquor transactions. These transactions required Bratcher to develop a valuation model in order to perform an analysis of the subject brands' "brand contribution" taking into account the brand profit, net of costs of goods sold, and brand support. As part of his negotiations with Beam, Bratcher took the lead on behalf of Luxco in analyzing and valuing the Acquired Brands. In performing his valuation analysis in his expert report, Bratcher used the same model and methodology that he has used in each of Luxco's 13 liquor transactions.

### III. Bratcher's Expert Opinions

#### A. Impact of LMFs

In Bratcher's expert report, he identifies Beam's alleged non-disclosures that affected the Acquired Brands' purchase price. He first discusses LMFs stating that Beam did not disclose certain aspects of its Distributor Agreements with Southern Wine & Spirits of America, Inc. ("Southern Wine & Spirits"), Republic National Distributing Company ("RNDC") and Glazer's Wholesale Drug Company, In. ("Glazer's"). More specifically, Bratcher asserts Beam did not disclose that it required these distributors to bank LMFs for use in price supports as related to the marketing and promotion of Beam brands. (R. 134-1, Bratcher Rep., at 4.) He also stated: "These include free goods give-aways and discounts to support sales of the acquired brands as well as brands not sold to Luxco by Beam" and that it was his "understanding that those LMF funds were used by the distributors to meet annual sales and profit targets set by Beam, at the risk of substantial penalties if they were not achieved." (*Id*. at 4-5.) Bratcher further opines that "[h]ad the LMF funding been disclosed to Luxco, Luxco would have reduced the reported number of shipped cases and thus the brands' contribution to the margin in the Brand Detail Sheet substantially, resulting in a decreased purchase price." (*Id*. at 5.)

5

At his deposition, Bratcher explained that in determining the breach of warranty damages, he relied upon the same valuation model that the parties used when negotiating the relevant APA. (R. 134-2, Bratcher Dep., at 21.) In his expert report, Bratcher sets forth Table 1 that reflects the impact of the undisclosed LMF funds on the shipped cases Beam reported in the Brand Detail Sheet and its dollar impact on the contribution margin that Beam reported.[1] At his deposition, Bratcher described how he calculated the dollar impact on the contribution margin, including that the starting point was a spreadsheet provided by Beam showing the amount of cases by brand and distributor, namely, the Brand Detail Sheet memorialized as Schedule 3.14. (Bratcher Dep., at 29-30.) Similarly, Bratcher attaches a spreadsheet to his expert report at Exhibit (i), which details the brand cases, net sales, gross profit, brand investment, and brand contribution. (Bratcher Rep., Ex. (i)). In calculating the LMF impact total dollar amount as reflected in Table 1, Bratcher relied on the undisputed LMF per case amount of $1.66 for the distributor RNDC and $.50 for per case for Glazer's and Southern Wine & Spirits. He then multiplied the depleted cases, namely, the number of cases that the LMFs affected, by the per case amount. (Bratcher Dep., at 39-40.)

**B.     Wolfschmidt Credits**

Next, Bratcher offers his damages analysis in relation to Beam's non-disclosure of credit agreements with Southern Wine & Spirits in the states of Arizona and Florida for the year 2012. He specifically states that "I now understand that those credit agreements relieved Southern

---

[1] At his deposition, Bratcher refers to "contribution margin" as "Contribution After Marketing and Promotion" or "CAMP." (R. 134-2, Bratcher Dep., at 22). Barron's Dictionary of Accounting Terms defines "contribution margin" as the "difference between sales and the variable costs of the product or service." *Barron's Dictionary of Accounting Terms,* 90 (6th ed. 2014).

Wine & Spirits of the risk of paying penalties to Beam in those states due to Southern Wine & Spirits' inability to achieve Beam's profit targets for the sales of Wolfschmidt vodka for those states." (*Id*. at 5.) Bratcher asserts that these Wolfschmidt credits "directly resulted in inflated sales activity that Beam did not discount in its Brand Detail Sheet and Schedule 3.14." (*Id.*) Further, he opines – "Had the credits been disclosed to Luxco, Luxco would have reduced its calculation of shipped cases and Beam's report of Wolfschmidt vodka's contribution to margin substantially, resulting in a lower purchase price." (*Id*.)

In his expert report, Bratcher presents Table 2, which shows the impact of Wolfschmidt credits on shipped cases. As a starting point, Bratcher used the Brand Detail Sheet for TTM October 2012 – as provided by Beam. Bratcher's spreadsheet at Exhibit (i), which details the brand cases, net sales, gross profit, brand investment, and brand contribution, also reflects that he used $1.22 as the margin per case for Wolfschmidt vodka for TTM October 2012. (Bratcher Rep., Ex. (i); Bratcher Dep., at 31.) Bratcher testified at his deposition that he used the margin per case amount from the original Brand Detail Sheet. (Bratcher Dep., at 31.) He then multiplied the depleted cases, which is the number of cases that the Wolfschmidt credits affected, by the margin per case to arrive at the numbers in Table 2. (*Id*.; R. 105-1, Bratcher Dep. at 113.)

### C. Free Goods and Special Deals

In addition, Bratcher discusses the impact that Beam's free goods and special deals had on the purchase price of the Acquired Brands. He posits that these free goods and special deals artificially enhanced the sales Beam reported in the Brand Detail Sheet and Schedule 3.14. (*Id*. at 6-7.) Bratcher also opines that "[h]ad free goods activity and special deals with distributors

7

been disclosed by Beam, Luxco would have reduced the shipment and brand contribution numbers ... significantly reducing the purchase price." (*Id*. at 7.)

On page 7 of his expert report, Bratcher sets forth Table 3 that reflects the calculation of the free goods and special deals related to Bellows, Calvert Extra, Dark Eyes, Tempo Triple Sec, Lord Calvert, Canadian House, and Wolfschmidt Vodka. The Table also contains a line item for State of Washington excess inventory. As reflected in Exhibit (i), Bratcher applied the same valuation model that he did for calculating the LMFs and Wolfschmidt credits, namely, he multiplied the depleted cases by the margin per case. At his deposition, Bratcher clarified that he used the margins provided by the Brand Detail Sheet. (Bratcher Dep., at 37.) He also explained his calculation concerning the State of Washington excess inventory, clarifying that Washington had more inventory than it could use within a reasonable time period and that the depleted cases represented the load in extra inventory. (Bratcher Dep. at 45.)

**DAUBERT STANDARD**

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the

8

Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016). The Seventh Circuit has clarified that *Daubert*'s reliability and relevancy requirements "continue to apply in a bench trial." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). "However, the usual concerns of the rule – keeping unreliable expert testimony from the jury – are not present in such a setting[.]" *Id.*

Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the [factfinder] with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood*, 807 F.3d at 834 (citation omitted). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## NEW YORK CONTRACT LAW

New York law governs Luxco's breach of warranty claim pursuant to the governing law provision, § 10.8 of the APA. "Under New York law, an express warranty is part and parcel of

9

the contract containing it and an action for its breach is grounded in contract." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007); *see also CBS Inc. v. Ziff-Davis Pub. Co.,* 75 N.Y.2d 496, 503, 553 N.E.2d 997, 554 N.Y.S.2d 449 (1990) ("The express warranty is as much a part of the contract as any other term."). "A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch,* 500 F.3d at 185. New York courts determine breach of warranty damages under the benefit of the bargain rule, which is measured as the difference between the value the seller warranted and the objective or true value at the time of the transaction. *See id.*; *Powers v. Stanley Black & Decker, Inc.,* 137 F. Supp. 3d 358, 386 (S.D.N.Y. 2015); *see also Bennett v. U.S. Trust Co. of New York,* 770 F.2d 308, 316 (2d Cir. 1985) ("Under New York law, breach of warranty damages are usually measured by the benefit of the bargain rule."). In other words, "where the seller makes misrepresentations about the business he is selling, the natural and probable result is that the business is actually worth less than the buyer paid, and diminution of value damages therefore compensate the buyer for 'the value of the promised performance.'" *Powers*, 137 F. Supp. 3d at 386 (citation omitted). Also, under New York law, breach of contract damages "must not [be] merely speculative, possible or imaginary." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 110 (2d Cir. 2007) (citation omitted).

## ANALYSIS

### I.    Subjective Opinions

In its *Daubert* motion, Beam does not challenge Bratcher's qualifications. Instead, Beam argues that Bratcher's opinions are inadmissible because they are speculative and subjective, and

thus do not comport with the applicable measure of damages under New York law. Beam's argument speaks to *Daubert's* reliability and helpfulness requirements. *See Loeffel Steel Prod., Inc. v. Delta Brands, Inc.,* 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible" because "[t]hey cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact."). Indeed, it is well-established that expert testimony cannot "be based on subjective belief or speculation." *Metavante,* 619 F.3d at 761; *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 418 (7th Cir. 2005) ("relying on intuition [] won't do").

Beam highlights the following opinions from Bratcher's expert report as unsupported speculation:

- Had the LMF funding been disclosed to Luxco, Luxco would have reduced the reported number of shipped cases and thus the brands' contribution to the margin in the Brand Detail Sheet substantially, resulting in a decreased purchase price.

- Had the [Wolfschmidt] credits been disclosed to Luxco, Luxco would have reduced its calculation of shipped cases and Beam's report of Wolfschmidt vodka's contribution to margin substantially, resulting in a lower purchase price.

- Had free goods activity and special deals with distributors been disclosed by Beam, Luxco would have reduced the shipment and brand contribution numbers ... significantly reducing the purchase price.

The Court agrees that these statements are Bratcher's subjective and speculative opinions, namely, that had he known this information in his role as Luxco's President and Chief Operating Officer, Luxco would have reduced the purchase price. While Bratcher may be able to testify to what he would have done under the circumstances as a fact witness, as an expert damages witness, Bratcher's speculative and subjective opinions surmising what Luxco would

11

have done are inadmissible under *Daubert. See Metavante,* 619 F.3d at 761. Also, these opinions would not be helpful to the trier of fact. *See Matter of the Complaint of Ingram Barge Co.*, No. 13 C 3453, 2016 WL 3763450, at *10 (N.D. Ill. July 14, 2016) ("Expert testimony does not assist the trier of fact when [it] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony.").

## II. Methodology

As to Bratcher's damages calculations, Beam argues that these calculations are unreliable because Bratcher "fails to offer any meaningful explanation – let alone reliable methodology – to support his subjective, bottom-line conclusions." In support of this argument, Beam points to the Second Circuit's guidance in *Merrill Lynch* regarding breach of warranty damages:

> [T]he difference between the value of [the acquired business] as warranted and its value as delivered should be calculated. [The acquired business]'s value as delivered should reflect any deductions from its purchase price necessary to reflect the broken warranties. In other words, the district court should determine how [the acquired business] would have been valued by *knowledgeable investors* at the time of the sale were such investors aware of any breaches proved by [the buyer].

*Merrill Lynch,* 500 F.3d at 185 (emphasis added). Beam specifically points to the language regarding how "knowledgeable investors" would have valued the acquired business at the time of the sale had such investors been aware of any warranty breaches – arguing that Bratcher's opinions are not that of a "knowledgeable investor." In making this argument, Beam ignores its own damages expert's testimony that Bratcher is a "knowledgeable investor." (R. 146-2, Gallagher Dep., at 42.) Also, in its briefs, Beam fails to argue that Bratcher is not qualified to render his opinions. *See Gayton v. McCoy,* 593 F.3d 610, 618 (7th Cir. 2010) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the

12

witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.") (internal quote and citation omitted). Moreover, Bratcher has personally analyzed and evaluated approximately 50 potential liquor brand acquisitions for Luxco giving him extensive experience in this area. The Court therefore focuses on Beam's argument that Bratcher did not base his damages calculations on a reliable methodology.

In determining reliability, a "critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' that is properly excluded under Rule 702." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (quotation omitted). Also, whether a certain methodology is reliable under *Daubert* often turns on whether the methodology is generally accepted in the relevant expertise. *See Daubert,* 509 U.S. at 593-94; *Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). On the other hand, "reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology – the framework – of the expert's analysis." *Manpower,* 732 F.3d at 808. A "district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins,* 794 F.3d at 704 (citation omitted); *see also Wood*, 807 F.3d at 835 ("Ultimately, reliability is determined on a case-by-case basis.").

As discussed, New York courts measure breach of warranty damages under the benefit of the bargain rule, which is the difference between the value the seller warranted and the objective value at the time of the transaction. *See Merrill Lynch,* 500 F.3d at 185. In its *Daubert* motion, Beam argues that Bratcher's breach of warranty damages calculations are not based on an

13

objective valuation methodology. In response, Luxco contends that Bratcher's assessment of the value of the Acquired Brands is objective and reliable because Bratcher relied upon a multiple of earnings valuation, which is a common method for estimating the value of an ongoing business. *Cf. Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1069 (S.D.N.Y. 1996) ("multiple of earnings ... is widely recognized and accepted as a valuation technique"). Indeed, Beam's rebuttal damages expert, Mark Gallagher, admitted that Bratcher used a "multiple of earnings methodology" and that it is "an accepted methodology." (R. 146-2, Gallagher Dep., at 34.) In addition, the parties do not dispute that Bratcher based his damages calculation on the same model and methodology that Beam and Luxco used when the parties negotiated the APA in determining the Acquired Brands' "brand contribution." (*See id.* at 33-34.)

Turning to Bratcher's application of the multiple of earnings valuation, at his deposition and in his expert report, Bratcher described how he arrived at the damages amounts for Beam's alleged breach of the express warranty of Section 3.14 of the APA. The starting point for Bratcher's damages calculation was the Acquired Brands' sales, as reported by Beam during APA negotiations, and as reflected by the Brand Detail Sheet memorialized as Schedule 3.14. (Bratcher Rep., at 1, 3; Bratcher Dep., at 19-21.) Then, Bratcher subtracted the value of the costs of goods for the Acquired Brands, as well as all brand support. (Bratcher Rep., at 1; Bratcher Dep., at 22, 25-27, 111-12.) After the brand support (brand investment) was subtracted, Bratcher arrived at the Acquired Brands' "brand contribution," also known as "Contribution After Marketing and Promotion" or CAMP. (Bratcher Rep., at 1; Bratcher Dep., at 22.) Bratcher then multiplied this brand contribution number by 6.6 – the same multiplier negotiated by the parties and applied to Beam's originally reported brand contribution number – to reach a figure for the

14

Acquired Brands' value at the time of the transaction taking into account the undisclosed brand support. (*Id*. at 22-23, 110, 113.)

Despite Bratcher's detailed explanation of how he applied the multiple of earnings valuation to the underlying facts, Beam points to an isolated statement from Bratcher's deposition testimony to support its argument that Bratcher did not use a reliable methodology, namely, "I calculated the damages based on what I feel our price would have been had we known all the information at that time." (Bratcher Dep., at 16.) That Bratcher made this and a few other isolated comments as to what he "believed" or "felt" is not a sufficient basis to exclude all of his expert testimony under *Daubert*, especially in light of his detailed testimony and report describing how he applied the multiple of earnings valuation model. *See Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014) ("read in context, [the expert's] opinions do not appear to be true speculation"); *see also Stollings v. Ryobi Tech., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013) (The trier of fact "must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony"). Also, Beam's argument that Bratcher "was not attempting to apply – and was not even aware of – the applicable measure of damages under New York law" is misplaced because the appropriate legal standard is "a subject for the court, not for testimonial experts." *United States v. Lupton,* 620 F.3d 790, 800 (7th Cir. 2010); *see also Jimenez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013) ("an expert may not offer legal opinions"). Regardless, Bratcher's measure of damages is consistent with New York law.

The remainder of Beam's challenges to Bratcher's methodology are factual challenges. Beam, for example, argues that Beam's distributors – and not Beam – provided the price supports, such as LMF funds and free goods. This is a hotly disputed factual issue, and at

15

summary judgment, Luxco presented evidence raising a triable issue of fact as to the funding of the price supports. It is well-settled under *Daubert,* that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.,* 782 F.3d 353, 360 (7th Cir. 2015) (citation omitted); *see also Lapsley*, 689 F.3d at 805 ("the accuracy of the actual evidence is to be tested before the [factfinder] with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'") (citations omitted). In fact, a "district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806.

Last, Beam's argument – raised only in a footnote – that the Court should bar Bratcher's opinions as to the parties' Transition Service Agreement – is waived. *See Thulin v. Shopko Stores Operating Co., LLC,* 771 F.3d 994, 997 (7th Cir. 2014). The Court also reminds the parties that arguments made for the first time in a reply brief are waived. *See United States v. Lacy,* 813 F.3d 654, 658 (7th Cir. 2016).

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part Beam's motion to strike Luxco's damages expert David Bratcher under *Daubert*.

**Dated:** September 6, 2016

**ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**