**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUXCO, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | Case No. 14 C 0349 |
| v. | ) | |
| | ) | |
| JIM BEAM BRANDS, CO., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

The parties tried this case before the Court in a three-day bench trial starting on

November 28, 2016 and concluding on November 30, 2016. This Memorandum Opinion and

Order sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of

Civil Procedure 52. For the following reasons, the Court finds:

> 1. Plaintiff/Counter-Defendant Luxco, Inc. ("Luxco") did not establish by a preponderance of the evidence that Defendant/Counter-Plaintiff Jim Beam Brands Co.'s ("Beam") breached the parties' express warranty in Section 3.14 of the parties' Asset Purchase Agreement ("APA"); and

> 2. Because Luxco failed to establish by a preponderance of the evidence that Beam breached Section 3.14 of the APA, Luxco's performance under the parties' Transaction Services Agreement ("TSA") is not excused and Beam is entitled to judgment, costs, and prejudgment interest for Luxco's breach of the TSA.

The Court directs the parties to meet and confer by February 13, 2017 on the amounts to

be added to Beam's judgment for prejudgment interest and costs. If the parties cannot reach an

agreement on the amounts to be added to the judgment, Beam must file a post-judgment brief

setting out its position as to any outstanding disputes by February 20, 2017 and Luxco must file

any objections to Beam's brief by February 27, 2017.

# BACKGROUND

## I.     Procedural Background

On June 6, 2016, the Court granted in part and denied in part Beam's Rule 56(a) motion for summary judgment.  The remaining claims in this lawsuit include:  (1) Count I of the First Amended Complaint in which Luxco alleges that Beam breached the express warranty in Section 3.14 of the parties' APA; and (2) Beam's breach of contract counterclaim in which Beam alleges that Luxco breached the parties' TSA.  The Court presumes familiarity with all of its prior rulings in this lawsuit.

At the November 2016 bench trial, the parties called the following witnesses:  (1) Donn Lux, Luxco's Chairman and Chief Executive Officer; (2) Dan Streepy, Luxco's Executive Vice President of Sales; (3) David Bratcher, Luxco's President, Chief Operation Officer, and expert damages witness; (4) John Lee, Beam's former Vice President of Strategy and Corporate Development; (5) Martin Jones, Beam's industry and custom expert; and (6) Mark Gallagher, Beam's rebuttal damages expert.  The parties further provided deposition designations for the following witnesses:  (1) Kevin Cooke, Beam's former Vice President of Sales Strategy; (2) Anthony Truzzolino, Beam's former General Sales Manager for the Southern Region; (3) Patrick Hurrle, Vice President of Sales for Republic National Distributing Company ("RNDC"); (4) Tom Cole, RNDC's President; (5) Nicholas Fink, Beam's former Senior Vice President and Chief Strategy Officer; (6) Jared Fix, Beam's former General Manager of Cordials and Regional Brands; (7) William Newlands, Beam's former President of North America; and (8) John Lee,

Beam's former Vice President of Strategy and Corporate Development.[1]

## II. Findings of Fact

### A. Introduction

Luxco is a Missouri-based supplier and bottler of beverage alcohol products and is a privately held corporation. (R. 151-1, Sch. A, Stmt. Uncontested Facts ¶ 1; R. 180, 11/30 Trial Tr. at 662.) Beam is an Illinois-based supplier and bottler of beverage alcohol products and, as a publicly traded company, Beam must follow the United States Securities and Exchange Commission's ("SEC") requirements. (Uncontested Facts ¶ 2; R. 179, 11/29 Trial Tr. at 373 (Lee).) In the United States, beverage alcohol products are sold and regulated under a three-tiered distribution system comprised of suppliers, distributors, and retailers. (Uncontested Facts ¶ 5.) Each tier in the distribution system consists of "entirely different, separate companies" with their own board of directors, ownership, and financial statements. (11/29 Trial Tr. at 381-82 (Lee); 11/30 Trial Tr. at 511 (Jones).) As alcohol suppliers, Beam and Luxco do not sell alcohol products directly to retail stores, bars, or restaurants. (Uncontested Facts ¶ 5.) Instead, Beam and Luxco sell alcohol products to third-party distributors, who in turn sell these products to retail stores, bars, and restaurants. (*Id*.) Moreover, distributors are sales and marketing companies that buy beverage alcohol products from suppliers and then sell, market, and deliver these products to retail customers. (11/29 Trial Tr. at 381-82 (Lee); 11/30 Trial Tr. at 522-23 (Jones).)

---

[1] Pursuant to Federal Rule of Civil Procedure 32(a)(3), the Court granted Luxco's request to present deposition designations of former Beam officer John Lee although Lee was also a live witness at trial. (162, 10/24/16, Mem. Op. & Order.)

In early 2012, Beam and Luxco began discussing Beam's potential sale to Luxco of the exclusive right to sell thirteen alcohol brands of alcohol beverages, which ultimately included Bellows® Blended, Bellows® Bourbon, Bellows® Gin, Bellows® Light Rum, Bellows® Scotch, Bellows® Vodka, Calvert® Extra, Calvert® Gin, Canada House® Canadian, Dark Eyes® Vodka, Lord Calvert® Canadian, Tempo® Triple Sec, and Wolfschmidt® Vodka (hereinafter the "Acquired Brands").  (Uncontested Facts ¶ 6.)  The Acquired Brands were part of what Beam referred to colloquially as its "tail brands," "economy brands," or "value category," meaning brands that resulted in a lower profit margin for Beam than its more lucrative brands.  (R. 151-7, Sch. G, Beam Stmt. Facts ¶ 15;[2] 11/29 Trial Tr. at 395-96 (Lee).)  Before Beam's sale of the Acquired Brands to Luxco, third-party distributors, including Southern Wine and Spirits ("Southern"), RNDC, and Glazer's, distributed the Acquired Brands throughout the United States.  (Uncontested Facts ¶ 7.)  These three distributors account for approximately 80% of Beam's beverage alcohol sales.  (Luxco Stmt. Facts ¶ 88.)

B.     **The Parties' Agreements**

1.     **The Asset Purchase Agreement**

Luxco and Beam executed the APA on January 18, 2013 for a total purchase price of $70,079,014, under which Luxco acquired from Beam the exclusive right to sell the Acquired Brands.  (Uncontested Facts ¶ 8; Luxco's Stmt. Facts ¶ 42; 11/29 Trial Tr. at 485 (Lee).)  The parties agree that the APA is a valid contract and that it closed on January 31, 2013. (Uncontested Facts ¶¶ 8, 9; *see also* 11/29 Trial Tr. at 485 (Lee).)  As part of the APA

---

[2]  The Court cites to portions of Beam's and Luxco's proposed findings of facts that are uncontested.

4

negotiations, Luxco bargained for and negotiated the terms, warranties, and conditions of the sale of the Acquired Brands from Beam to Luxco. (Luxco Stmt. Facts ¶¶ 7, 44.) Specifically, Luxco bargained for and purchased the representations and warranty in Section 3.14 of the APA. (*Id*. ¶ 45.) Section 3.14 states in its entirety:

> **Brand Detail Sheet**. The Brand Detail Sheet provided by the Seller to the Purchaser attached as Schedule 3.14 is true, complete and accurate in all material respects.

(Beam Stmt. Facts ¶ 18a; PX-033; DX-001.) Schedule 3.14 is a spreadsheet that lists the Shipped Cases and Net Sales for the years 2009 through 2011 and the trailing twelve month period ("TTM period") of October 2012 for all of the Acquired Brands. (11/29 Trial Tr. at 303, 305 (Bratcher); Beam's Stmt. Facts ¶ 23.) On the other hand, Schedule 3.14 does not reflect any information about the distributors' subsequent sales or shipments of the Acquired Brands to their retail customers. (R. 178, 11/28 Trial Tr. at 216 (Streepy); 11/29 Trial Tr. at 373-74 (Lee).) "Shipped cases" is a common term in the beverage alcohol industry referring to the number of cases that a supplier sells to its distributors. (11/28 Trial Tr. at 75 (Lux); 11/29 Trial Tr. at 374 (Lee); 11/30 Trial Tr. at 514 (Jones).) "Net sales" is a commonly used accounting term that is understood within the beverage alcohol industry. (11/30 Trial Tr. at 531 (Jones).) Net sales "refers to the net sales value after allowances, returns, discounts have been removed from ... gross sales." (*Id*. at 531-32 (Jones).) Put differently, net sales are "gross sales less sales returns and allowances and sales discounts." *Barron's Dictionary of Accounting Terms*, 273 (6th ed. 2014).

The parties used the Brand Detail Sheet in their contract negotiations and it formed the basis of the parties' calculation of the purchase price for the Acquired Brands. (Luxco Stmt.

Facts ¶ 24; 11/28 Trial Tr. at 91, 110-11 (Lux).)  At trial, John Lee, Beam's former Vice

President of Strategy and Corporate Development, testified that he was the lead corporate

development person on the transaction and that he was directly involved in preparing Schedule

3.14 that reflects part of the original Brand Detail Sheet.  (11/29 Trial Tr. at 369, 371, 373

(Lee).)  He testified that – under his supervision – he asked Beam's accounting team to pull the

historical net sales and case shipment data from Beam's financial reporting system, which is the

same system that feeds into Beam's public financial statements that it reports to the SEC.  (*Id.* at

373.)

      The APA also includes the following limitations:

> 3.20 Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS
> AGREEMENT OR ANY ANCILLARY DOCUMENT, THE SELLER MAKES
> NO REPRESENTATIONS OR WARRANTIES OF OR CONCERNING THE
> PRODUCTS, THE ACQUIRED ASSETS OR THE ASSUMED CONTRACT
> AND HEREBY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES
> WITH RESPECT THERETO.  WITHOUT LIMITING THE GENERALITY OF
> THE FOREGOING, THE SELLER DOES NOT MAKE ANY
> REPRESENTATION OR WARRANTY AS TO THE FUTURE SALES OR
> PROFITABILITY OF THE PRODUCTS.  ALL SUCH OTHER
> REPRESENTATIONS AND WARRANTIES, AND ALL REPRESENTATIONS
> AND WARRANTIES OTHER THAN THOSE SET FORTH IN THIS ARTICLE
> III, ARE HEREBY EXPRESSLY DISCLAIMED BY THE SELLER.

(Beam Stmt. Facts ¶ 18b.)  Another relevant section of the APA is its integration clause, which

states:

> 10.6.  Entire Agreement.  This Agreement (including the Exhibits and Schedules
> hereto) and the Ancillary Documents, when executed and delivered, constitute the
> entire agreement and supersede all prior agreements and understandings, both
> written and oral, between the Parties with respect to the subject matter hereof and
> thereof."

(*Id.* ¶ 18d.)

## 2.    The Transaction Services Agreement

Pursuant to Section 2.2 of the APA, Beam and Luxco also entered into a TSA dated February 1, 2013, and subsequently amended on April 1, 2013.  (Uncontested Facts ¶ 22; PX-035.)  Under the TSA, Beam agreed – for a period of one year following the APA's closing – to process, bottle, store, and ship certain of the Acquired Brands on Luxco's behalf.  (Uncontested Facts ¶ 23.)  As part of the TSA, Luxco agreed to purchase certain minimum volume targets of the Acquired Brands products from Beam set forth in Section 4(c) and Exhibit II of the TSA.  (*Id.* ¶ 24.)  Pursuant to the TSA's terms, if the target volume exceeded the actual volume, Luxco would pay Beam a penalty or "True-Up Amount."  (*Id.* ¶ 25.)  It is undisputed that the target volume exceeded the actual volume such that the True-Up Amount is $393,215.  (*Id.* ¶ 26; 11/29 Trial Tr. at 353-55 (Bratcher).)

By letter dated February 10, 2014, Beam provided Luxco with the contemplated "True-Up Schedule," pursuant to the TSA and stated that the "true-up schedule shows a net amount payable by Luxco to Beam of $393,215."  (Luxco Stmt. Facts ¶ 202.)  In the February 10, 2014 letter, Beam also requested that Luxco "confirm that [it] does not dispute the calculation," which, Beam noted, would "be deemed final," under the terms of the TSA, "if Beam does not receive notice of any dispute from Luxco by March 10, 2014."  (*Id.* ¶ 203.)  Luxco responded on February 28, 2014, stating that it agreed that Beam had stated the correct number of cases of product purchased by Luxco from Beam over the stated period, and that, pursuant to the terms of the TSA, Luxco did not dispute Beam's calculation.  (*Id.* ¶ 204; DX-055.)  Also in its February 28, 2014 correspondence, Luxco stated it would not pay the True-Up amount demanded by Beam because Luxco was entitled to set off any amount due under the TSA against the

prospective judgment that it seeks in this action based on Beam's alleged breach of the APA. (Luxco Stmt. Facts ¶ 205.)  To date, Luxco has not paid the True-Up amount to Beam pursuant to the TSA.  (11/29 Trial Tr. at 355 (Bratcher).)

C.      **Beam's Distributor Agreements**

Beam and Luxco sell beverage alcohol products to third-party distributors, who in turn sell these products to retail stores, bars, and restaurants.  (Uncontested Facts ¶ 5.)  Distributors are sales and marketing companies that buy from suppliers and then sell, market, and deliver alcohol products to retail customers.  (11/29 Trial Tr. at 381-82 (Lee); 11/30 Trial Tr. at 522-23 (Jones).)  Before Beam's sale of the Acquired Brands to Luxco, third-party distributors, including Southern, RNDC, and Glazer's, distributed the Acquired Brands throughout the United States.  (Uncontested Facts ¶ 7.)  Written distributor agreements ("Distributor Agreements") governed Beam's business relationships with these three distributors.  (*Id.* ¶ 11; Luxco's Stmt. Facts ¶ 87; PX-018 (RNDC); PX-049 (Southern); PX-052 (Glazer's)).  In the beverage alcohol industry, distributor agreements are extremely sensitive and confidential because disclosure could disrupt both the supplier's and distributor's competitive advantage.  (11/29 Trial Tr. at 428 (Lee); 11/30 Trial Tr. at 537-38 (Jones).)

In the Distributor Agreements at issue, Glazer's, Southern, and RNDC agreed to pay local marketing funds ("LMFs") toward marketing and promotion of the Acquired Brands.  (Uncontested Facts ¶¶ 12, 13; 11/29 Trial Tr. at 312-14 (Bratcher).)  Specifically, LMFs are payments made by a distributor into a "bank" or common fund, to be used for marketing, advertising, and promotion of alcohol products supplied by Beam and sold to its distributors.  (Luxco Stmt. Facts ¶ 107.)  In addition, Beam's Distributor Agreements with RNDC, Southern,

8

and Glazer's contained profit targets, including a depletion gross profit ("DGP") target, for the distributors. (Uncontested Facts ¶ 16.) The Distributor Agreements also contained provisions allowing Beam to assess a penalty against the distributor in certain circumstances for failing to meet these profit targets. (*Id.*)

### D.    Marketing and Price Support Programs

Both suppliers and distributors fund price supports and marketing programs to promote sales of the supplier's alcohol brands. (11/30 Trial Tr. at 518, 523-24 (Jones).) Marketing and price support programs include LMFs, entity grants, and free goods. (Uncontested Facts ¶ 15.) In this lawsuit, Luxco argues that Beam breached Section 3.14 due to Schedule 3.14's inaccurate, false, and incomplete shipment and net sales figures as a result of Beam's use of price supports, including LMFs, entity grants, free goods, and certain price credits.

### 1.    LMFs

In general, LMFs are payments made by a distributor into a bank or common fund to be used for marketing, advertising, and promotion of alcohol products. (Luxco Stmt. Facts ¶ 107.) Credible trial evidence reveals that Beam did not provide payments in the form of LMFs to its distributors in connection with the Acquired Brands. (11/29 Trial Tr. at 312 (Bratcher).) Rather, the distributors used their own funds in the form of LMFs to market, promote, and advertise the Acquired Brands. (9/21/15 Truzzolino Dep. Tr. at 61; 6/30/15 Hurrle Dep. Tr. at 56-57; 11/30 Trial Tr. at 521-22, 525-26 (Jones).) Because the distributors funded the LMFs, they are accounted for in the distributors' financial statements – not Beam's financial statements. (11/29 Trial Tr. at 323-24 (Bratcher); 11/30 Trial Tr. at 525-26 (Jones).) In addition, although Beam sets certain goals and guidelines for its distributors in relation to LMFs, the distributors

ultimately made the decision on how to use LMFs. (9/21/15 Truzzolino Dep. Tr. at 61.) Further, Beam's industry and customs expert testified that it is common for suppliers and distributors to negotiate the LMF rates that are memorialized in distributor agreements. (11/30 Trial Tr. at 523-24 (Jones).) It is undisputed that there are no representations or warranties in the APA that specifically refer to LMFs. (11/28 Trial Tr. at 148 (Lux).)

    2.    **Entity Grants**

Entity grants are funds that a supplier, such as Beam or Luxco, provides to a distributor to support the supplier's brands. (Uncontested Facts ¶ 10; Beam Stmt. Facts ¶ 35; 11/30 Trial Tr. at 518 (Jones).) Entity grants are commonly used in the beverage alcohol industry and distributors use entity grants for price support, including quantity discounts, price-off programs, and to fund free goods. (11/30 Trial Tr. at 518-19 (Jones).) Consistent with industry practice and the Generally Accepted Accounting Principles ("GAAP") for publicly traded companies, Beam deducts the amount of money it spends on entity grants between the gross and net sales lines on its profit and loss statement. (11/29 Trial Tr. at 375-76 (Lee); 11/30 Trial Tr. at 518-20 (Jones).) Beam's former General Sales Manager for the Southern Region Anthony Truzzolino specifically testified that "[e]ntity grants are deducted before net sales value," and are "not part of the costs of goods." (9/21/15 Truzzolino Dep. at 57.)

Before the APA's closing on January 31, 2013, Beam provided Luxco with a spreadsheet identifying the amount of entity grants accrued for each of the Acquired Brands to show that the entity grant funding had been accounted for and deducted ("netted out") from Beam's gross sales to achieve the "Net Sales" numbers reported on Schedule 3.14 of the APA. (Luxco Stmt. Facts ¶ 75; 11/28 Trial Tr. at 219-20 (Streepy).) Beam specifically reported to Luxco that the "Net

Sales" reported on Schedule 3.14 were net of $2,163,028 in entity grant payments to distributors. (Luxco Stmt. Facts ¶ 76.)  As such, Luxco does not dispute that Beam accounted for the entity grants in its Net Sales figures as reflected on Schedule 3.14, and thus Luxco is not pursuing any claim based on entity grants in this lawsuit.  (11/28 Trial Tr. at 152-54 (Lux); 11/28 Trial Tr. at 270 (Bratcher); 11/30 Trial Tr. at 697 (closing).)

### 3.   Free Goods

The term "free goods" refers to a type of discount or promotion involving beverage alcohol products that a distributor offers to its retailers.  (Uncontested Facts ¶ 14; 11/29 Trial Tr. at 312 (Bratcher); 11/30 Trial Tr. at 529-30 (Jones).)  An example of a free goods discount is when a distributor offers a retailer one free case of alcohol products for every ten cases the retailer buys.  (Uncontested Facts ¶ 14; 11/30 Trial Tr. at 530 (Jones).)  Trial evidence establishes that Beam did not offer free goods discounts to its distributors nor did Beam require its distributors to use free goods programs.  (11/28 Trial Tr. at 216 (Streepy); 11/30 Trial Tr. at 529-30 (Jones); 7/30/15 Fink Dep. Tr. at 232.)

For the Acquired Brands, distributors funded free goods discounts through entity grants, distributor LMFs, and distributor margins.  (Uncontested Facts ¶ 15.)  If a distributor funded its free goods discounts via entity grants, that funding would have been accounted for in the Net Sales figures in Schedule 3.14.  (11/29 Trial Tr. at 327 (Bratcher); 11/29 Trial Tr. at 384-85 (Lee).)  Indeed, the parties do not dispute that Beam deducted the amount of money it spent on entity grants between the gross and net sales lines on its profit and loss statement in this matter. (11/28 Trial Tr. at 152-54 (Lux); 11/28 Trial Tr. at 270 (Bratcher); 11/29 Trial Tr. at 375-76 (Lee); 11/30 Trial Tr. at 518-20 (Jones); 11/30 Trial Tr. at 697 (closing).)  If the distributor

funded its free goods programs through its own LMFs or margin, the distributor would then incur that expense, which would be reflected on the distributor's financial statements – not Beam's financial statements. (11/29 Trial Tr. at 323-24 (Bratcher); 11/29 Trial Tr. at 384-85 (Lee); 11/30 Trial Tr. at 527-29 (Jones).) In addition, as early as December 2012, Beam disclosed to Luxco that its distributors offered "free goods" discounts on the Acquired Brands and Luxco's Executive Vice President of Sales testified at trial that he discussed free goods with Southern in early December 2012. (PX-068; 11/28 Trial Tr. at 234-36 (Streepy).)

### E. Wolfschmidt Credits

Also at issue in this lawsuit is how Beam accounted for certain Wolfschmidt credits in relation to Schedule 3.14. In particular, Beam's distributor agreements with RNDC, Southern, and Glazer's contained certain profit targets, including a depletion gross profit ("DGP") target, for the distributors. (Uncontested Facts ¶ 16.) The distributor agreements also contained provisions allowing Beam to assess a penalty against the distributor in certain circumstances for failing to meet such targets. (*Id.*) In two instances in March 2012, Beam decided to forego imposing a penalty on one of its distributors, Southern, for failing to meet its DGP target for 2012. (*Id.* ¶ 17; Beam's Stmt. Facts ¶ 46.) Beam excused Southern from paying a penalty by issuing a credit against Southern's 2012 DGP targets for Arizona and Florida. (Uncontested Facts ¶ 17; PX-062; PX-063.)

These Wolfschmidt credits, however, were not credits in the financial sense, but were credits against a profit plan target set forth in the relevant Distributor Agreement. (9/21/15 Truzzolino Dep. at 78; 11/30 Trial Tr. at 545 (Jones).) In other words, the Wolfschmidt credits were not price supports nor did they involve a financial transaction. (9/21/15 Truzzolino Dep. at

102-03.)  As a result of Beam not incurring any expenses in connection with these Wolfschmidt profit plan credits, Beam did not reflect these "expenses" as a deduction in its reported net sales. (11/29 Trial Tr. at 385-88 (Lee).)

### F. Washington State Excess Inventory

Luxco also argues that Beam breached Section 3.14 by failing to disclose that one of its distributors in Washington State had excess Wolfschmidt inventory.  Prior to signing the APA, Beam provided Luxco with the following data for the TTM period ending October 31, 2012 (i.e., November 2011 through October 2012):  (1) the number of cases of Wolfschmidt that Beam shipped to Washington State (32,724 cases); and (2) the number of Wolfschmidt depletions (i.e., the number of cases distributors sold to retailers) for Washington State (15,991 cases).  (Beam Stmt. Facts ¶ 50; PX-069, PX-127.)  Beam also provided this same data to Luxco for the years 2009-11.  (Beam Stmt. Facts ¶ 50.)  In fact, Donn Lux, Luxco's Chairman and Chief Executive Officer, testified at trial that he was aware of the excess inventory in Washington State before the APA's closing.  (11/28 Trial Tr. at 140 (Lux); PX-95.)  During due diligence discussions, Beam explained to Luxco that it was taking a price position in Washington State on economy vodka, namely, Wolfschmidt, and that the excess inventory was due to Beam gearing up for this transition in the context of the state's change in distribution structure.  (11/28 Trial Tr. at 199-200, 233 (Streepy)).  Further, at trial, Luxco's Executive Vice President of Sales Dan Streepy admitted that the parties would not "be here today if the fight was only about excess inventory in Washington."  (11/28 Trial Tr. at 281 (Streepy).)

## STANDARD OF DECISION

Where, as here, an action is "tried on the facts without a jury," Rule 52 requires the district court to "find the facts specially and state its conclusions of law separately." *See* Fed.R.Civ.P. 52(a); *see also Hernandez v. Cardoso,* 844 F.3d 692, 695 (7th Cir. 2016); *Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, 733 F.3d 700, 704 (7th Cir. 2013). Under Rule 52, the district court must "explain the grounds" of its decision and otherwise demonstrate a "reasoned, articulate adjudication." *Aprin v. United States,* 521 F.3d 769, 776 (7th Cir. 2008); *see also Xodus v. Wackenhut Corp.,* 619 F.3d 683, 686 (7th Cir. 2010) ("while [the district court] need not address each piece of evidence, the court must include sufficient subsidiary facts so that we can clearly understand the steps by which it reached its ultimate conclusion."). Also, the "trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity." *Khan v. Fatima,* 680 F.3d 781, 785 (7th Cir. 2012).

In adjudicating the parties' claims, the Court has considered the totality of the evidence presented at the November 2016 bench trial, including the deposition designations that the parties submitted in advance of trial. Further, the Court has carefully considered the weight to be accorded the evidence, including the credibility of each witness. In assessing credibility, the Court considered, among other things, each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and, significantly, the believability of the witness' testimony in light of the other evidence presented. *See Anderson v. City of Bessemer, N.C.,* 470

U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Furry v. United States,* 712 F.3d 988, 993 (7th Cir. 2013).

In addition, the Court has considered the parties' arguments and the applicable law. The elements of the parties' claims are set forth below. The parties agree that New York law governs the claims in this case. This decision on the merits incorporates the Court's findings of fact and conclusions of law as required by Rule 52. *See* Fed R. Civ. P. 52(a); *Khan,* 680 F.3d at 786.

## GOVERNING LAW

New York law governs their parties' breach of contract claims pursuant to the governing law provisions of the APA and the TSA. "Under New York law, an express warranty is part and parcel of the contract containing it and an action for its breach is grounded in contract." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007); *see also CBS Inc. v. Ziff-Davis Pub. Co.,* 75 N.Y.2d 496, 503, 553 N.E.2d 997, 554 N.Y.S.2d 449 (1990) ("The express warranty is as much a part of the contract as any other term."). When construing a contract under New York law, a court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, 773 F.3d 110, 113 (2d Cir. 2014) (citation omitted). "[T]he words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.,* 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted); *see also Process Am., Inc. v. Cynergy Holdings, LLC,* 839 F.3d 125, 133 (2d Cir. 2016). "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *Chesapeake Energy Corp.*, 773 F.3d at 114 (quoting *Howard v.*

*Howard,* 292 A.D.2d 345, 740 N.Y.S.2d 71, 71 (N.Y. App. Div. 2002)). "Ambiguity exists only if a contract term 'is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *In re Lehman Bros. Holdings Inc.,* 761 F.3d 303, 309 (2d Cir. 2014) (citation omitted). If contract terms are ambiguous, the Court may consider "extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Trust Co. v. Franklin Advisers, Inc.,* 726 F.3d 269, 276 (2d Cir. 2013) (citation omitted).

"In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir. 2011); *see also Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011).

## ANALYSIS

### I.   Beam Did Not Breach Section 3.14 of APA

In Count I of the First Amended Complaint, Luxco alleged that Beam materially breached the express warranty in Section 3.14, which specifically states: "The Brand Detail Sheet provided by the Seller to the Purchaser attached as Schedule 3.14 is true, complete and accurate in all material respects." As discussed, the Brand Detail Sheet is embodied in Schedule 3.14 and is a spreadsheet that lists the Shipped Cases and Net Sales for the years 2009 through 2011 and TTM period of October 2012 for all of the Acquired Brands. At summary judgment, Luxco argued that Beam breached Section 3.14 because Schedule 3.14 provided inaccurate,

false, and incomplete shipment and net sales figures as a result of Beam's use of price supports, including LMFs, entity grants, free goods, and certain price credits. Luxco also argued that Beam breached Section 3.14 by failing to disclose that one of its distributors in Washington State had excess Wolfschmidt vodka inventory. In making this argument at summary judgment, Luxco asserted that Beam's incentive and sales programs artificially inflated the Net Sales and Shipped Cases numbers as stated on Schedule 3.14. (R. 102, Luxco's Resp. Brief at 17-19.)

At trial, Beam set forth credible evidence conclusively demonstrating that it accounted for the incentive and marketing programs and that these programs did not artificially inflate the Net Sales or Shipped Cases numbers reflected on Schedule 3.14. Specifically, Beam's former Vice President of Strategy and Corporate Development John Lee – who was familiar with Beam's financial statements as part of his strategy role – testified that Beam created Schedule 3.14 by pulling the historical net sales and case shipment data from Beam's financial reporting system, which is the same system that feeds into Beam's public financial statements that it reports to the SEC. (11/29 Trial Tr. at 369, 373 (Lee).) Turning to the alleged price supports that Luxco claims inflated this data, Luxco has admitted that "Local Marketing Funds are payments made by a distributor into a 'bank' or common fund." (Luxco Stmt. Fact ¶ 107.) Luxco's President and Chief Operation Officer David Bratcher corroborated this uncontested statement by testifying at trial that "in this particular case, the Local Marketing Funds were payments that were made by the distributor." (11/29, Trial Tr. at 312 (Bratcher).) Beam's former General Sales Manager for the Southern Region, Anthony Truzzolino, clarified that "we could not demand [distributors] to do things with the LMF" because "it was distributor deposited and distributor generated." (11/21/15 Truzzolino Dep. at 61.) Furthermore, at trial, Beam

presented testimony of its industry and custom expert Martin Jones, who has been in the beverage alcohol industry for decades. Jones testified that under the circumstances, LMFs "are distributor monies" that are "contributed by the distributor" and "stay on the distributor's book." (11/30 Trial Tr. at 525 (Jones).) Indeed, on cross-examination, Luxco's Bratcher admitted that if a distributor incurred LMF expenses, these expenses would be accounted for on the distributor's financial statement. (11/29 Trial Tr. at 323-24 (Bratcher).) Based on this trial evidence, Luxco has failed to established by a preponderance of evidence that the use of LMFs artificially inflated the Net Sales and Shipped Cases figures set forth on Schedule 3.14. Instead, trial evidence shows that because the distributors paid LMFs through their own funds, these funds would be on the distributor's books, and not reflected in Beam's financial statements that were the basis for Schedule 3.14.

In addition, Luxco does not dispute that Beam accounted for the entity grants in its Net Sales figures as reflected on Schedule 3.14. As explained, entity grants are funds that a supplier, such as Beam or Luxco, provides to a distributor to support the supplier's brands. (Uncontested Facts ¶ 10.) At trial, Beam's Lee testified that entity grants are defined by Beam's "financial auditors as a pricing allowance or discount; and, therefore, under GAAP standard for a public company, we need to report it between gross and net sales." (11/29 Trial Tr. at 376 (Lee).) Beam's Truzzolino corroborated this testimony specifically stating that "[e]ntity grants are deducted before net sales value," and are "not part of the costs of goods." (9/21/15 Truzzolino Dep. at 57.) Lee further testified that prior to closing he explained to Luxco that "the entity grant support [] sits between gross and net sales." (11/29 Trial Tr. at 376 (Lee); PX 46.) More specifically, before the APA's closing on January 31, 2013, Beam provided Luxco with a

spreadsheet identifying the amount of entity grants accrued for each of the Acquired Brands to show that the entity grant funding had been accounted for and netted out from Beam's gross sales to achieve the "Net Sales" numbers reported on Schedule 3.14. (Luxco Stmt. Facts ¶ 75; 11/28 Trial Tr. at 219-20 (Streepy).) Luxco also admits that Beam reported to Luxco that the "Net Sales" reported on Schedule 3.14 were net of $2,163,028 in entity grant payments to distributors. (Luxco Stmt. Facts ¶ 76.) As such, Luxco does not dispute that Beam accounted for the entity grants in its Net Sales figures as reflected on Schedule 3.14, therefore, Luxco is not pursuing any claim based on entity grants in this lawsuit. (11/28 Trial Tr. at 152-54 (Lux); 11/28 Trial Tr. at 270 (Bratcher).) Out of an abundance of caution, at closing, the Court directly asked Luxco if it was pursuing its theory of liability based on the entity grants, to which Luxco answered "no." (11/30 Trial Tr. at 697 (closing).)

Next, the Court turns to Luxco's argument that "free goods" inflated the Net Sales and Shipped Cases figures on Schedule 3.14. The parties agree that the term "free goods" refers to a type of discount or promotion involving alcohol products and that for the Acquired Brands, free goods were funded by entity grants, LMFs, and distributor margins. (Uncontested Facts ¶¶ 14, 15.) As discussed directly above, Luxco is not arguing that free goods promotions funded by entity grants inflated the Net Sales and Shipped Cases figures in Schedule 3.14 because Luxco was aware that Beam netted out the entity grants from Beam's gross sales figures to achieve the "Net Sales" numbers reported on Schedule 3.14. Moreover, Beam's Lee testified that if a distributor funded "free goods" through LMFs, those funds would not be reflected on Beam's net sales numbers or anywhere else on Beam's profit and loss statements. (11/29 Trial Tr. at 385 (Lee).) Indeed, Luxco's Bratcher admitted that if a distributor incurred LMF expenses, these

19

expenses would be accounted for on the distributor's financial statement. (11/29 Trial Tr. at 323-24 (Bratcher); *see also* 11/30 Trial Tr. at 525 (Jones).) As to price supports funded by distributor margins, Beam's industry and custom expert Martin Jones elucidated that "a distributor is going to carve out a certain amount of his profit margin – his gross profit margin – to support the supplier's products." (11/30 Trial Tr. at 528-29 (Jones).) Jones further articulated that a price support based on a distributor's margin would not be reflected on the supplier's profit and loss statement because "it's part of the distributor's operation and his financial records. It's not part of the supplier's financial records." (*Id*. at 529 (Jones).) Based on this evidence, Luxco has failed to show by a preponderance of the evidence that the use of free goods artificially inflated the Shipped Cases and Net Sales figures reflected on Schedule 3.14.

Luxco also argues that Schedule 3.14 provided inaccurate, false, and incomplete shipment and net sales figures as a result of Beam's use of "Wolfschmidt credits" in relation to Beam's distributor Southern. It is uncontested that "Beam's Distributor Agreements with RNDC, Southern and Glazer's contained certain targets, including a depletion gross profit ("DGP") target, for the distributors. The Distributor Agreements contained provisions allowing Beam to assess a penalty against the distributor in certain circumstances for failing to meet such targets." (Uncontested Facts ¶ 16.) The parties also agree that in "two instances in March 2012, Beam decided to forego imposing a penalty on one of its distributors, [Southern], for failing to meet its DGP target for 2012. Beam excused [Southern] from paying a penalty in this circumstance by issuing a 'credit' against [Southern]'s 2012 DGP targets for Arizona and Florida." (*Id*. ¶ 17.) At trial, Lee explained, based on his knowledge of Beam's strategy practices, that "one of the things in the [distributor] contracts is our target to incentivize our

distributors for certain behaviors," so "in all of our distributor contracts there's a sales target and then there is a profit margin target."  (11/29 Trial Tr. at 385-86 (Lee).)  In addition, Lee stated that the Wolfschmidt credits for Arizona and Florida reflected Beam's "forgiveness" of Southern falling below a margin target.  (*Id*. at 387.)  Beam's Truzzolino corroborates this testimony when he clarified that the Wolfschmidt credits at issue were not financial credits, but instead involved a credit in relation to "the gross profit per case for every nine liter case sold for Wolfschmidt for the state against their gross profit plan," and thus "there was no financial transaction."  (9/21/15 Truzzolino Dep. at 103; *see also* 11/30 Trial Tr. at 545 (Jones) ("These aren't financial credits. It's just a letter of relief for having to achieve a certain target.").)  Based on this compelling and credible evidence, Luxco has failed in its burden of showing by a preponderance of the evidence that the Wolfschmidt credits inflated the Net Sales and Shipped Cases figures on Schedule 3.14 because the credits did not involve financial credits, but reflected Beam's forgiveness of Southern not reaching a margin target.

Last, Luxco's argument that Beam failed to disclose the Washington State excess Wolfschmidt inventory is belied by the uncontested facts that Beam disclosed this information and that Luxco was aware of the shipment and depletion data for Wolfschmidt vodka prior to closing.  (Beam's Stmt. Facts ¶ 50; 11/28 Trial Tr. at 140 (Lux).)  In particular, Luxco does not contest Beam's statement of fact that "[p]rior to signing the APA, Beam provided Luxco with the following data for the TTM period ending October 31, 2012 (i.e., November 2011 through October 2012):  (1) the number of cases of Wolfschmidt that Beam shipped to Washington State (32,724 cases); and (2) the number of Wolfschmidt depletions (i.e., the number of cases distributors sold to retailers) for Washington State (15,991 cases)."  (Beam Stmt. Facts ¶ 50; *see*

*also* PX-069, PX-127.)  In fact, Donn Lux testified at trial that he was aware of the excess

Wolfschmidt vodka inventory in Washington State before the APA's closing.  (11/28 Trial Tr. at

140 (Lux).)  Even if Beam had failed to disclose this excess Wolfschmidt inventory prior to

closing, Luxco has not established that any such non-disclosure is a material breach of the APA,

especially in light of Dan Streepy's admission that the parties would not "be here today if the

fight was only about excess inventory in Washington."  (11/28 Trial Tr. at 281 (Streepy).)

Accordingly, Luxco has failed to prove by a preponderance of the evidence that Beam

materially breached Section 3.14 of the APA because Beam's incentive and sales programs,

including entity grants, LMFs, and free goods, did not artificially inflate the Net Sales and

Shipped Cases numbers as stated on Schedule 3.14.  Moreover, Luxco has not met its burden in

establishing by the preponderance of the evidence that the Wolfschmidt credits and excess

inventory in Washington State artificially inflated these numbers, and thus the Net Sales and

Shipped Cases numbers were true, complete, and accurate in all material respects.

Nevertheless, at trial, Luxco shifted its theory of liability.  To clarify, during its closing

argument, Luxco stated that it was "not contesting that Beam's internal data may have reported

internally at Beam that there were shipped cases in that amount or that Beam's internal books

and records may have shown, from Beam's perspective, that there were net sales in that

amount."  (11/30 Trial Tr. at 644 (closing).)  Instead, Luxco argues that Beam's warranted Net

Sales and Shipped Cases numbers were not "complete" in all material respects because Schedule

3.14 did not contain the underlying data that was driving the Shipped Cases and Net Sales

numbers.  (*Id.* at 646-47 (closing).)  More specifically, Luxco asserts that to make Schedule 3.14

"complete" in all material respects, Beam should have added three or four footnotes to Schedule

3.14 explaining that the Shipped Cases and Net Sales data were based on "what Beam was doing with its distributors to drive those numbers." (*Id*. at 646 (closing).) In its post-trial brief, Luxco argues that Beam controlled expenditures that drove the reported net sales and shipments rendering Schedule 3.14 incomplete in all material respects.

In making this argument, Luxco asks the Court to construe the definition of "complete" from the plain reading of the warranty language set forth in Section 3.14 by referring to dictionary definitions. Indeed, "it is common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words of a contract." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (internal citation omitted); *see also Eastman Kodak Co. v. Asia Optical Co.,* No. 11 CIV. 6036 DLC, 2012 WL 917393, at *7 (S.D.N.Y. Mar. 16, 2012) ("Where a contractual term is undefined, a court may resort to dictionary definitions to ascertain its ordinary meaning."). According to Luxco, "complete" is broader than "accurate" or "true" and means "all inclusive" or "not lacking in anyway." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) (complete: *adj*…1a: "having all necessary parts, elements, or steps…4a: fully carried out: thorough; 4b. total, absolute...); THE COMPACT OXFORD ENGLISH DICTIONARY (2d ed. 1998) (complete: *adj*…1a: Having all its parts or members; comprising the full number or amount; embracing all the requisite items, details, topics, etc.; entire, full). Similarly, Beam argues that the plain meaning of "complete" is "comprehensive," meaning that the data in Schedule 3.14 includes everything it purports to include and does not omit net sales or case shipment data for the relevant time periods. *See* MERRIAM-WEBSTER DICTIONARY (defining "complete" as "having all necessary parts, elements, or steps"). Beam's and Luxco's definitions of "complete"

have considerable overlap because they rely on the same definition from the Merriam-Webster Dictionary, namely, "having all necessary parts, elements, or steps."

At issue, however, is how Luxco relies on its definition of "complete" to extrapolate an additional contractual obligation, namely, that Beam had a duty to disclose "what Beam was doing with its distributors to drive th[e] numbers" on the face of Schedule 3.14. *See Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992) ("The language of a contract is not made ambiguous simply because the parties urge different interpretations... [n]or does ambiguity exist where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'") (citation omitted). Despite Luxco's argument to the contrary, its interpretation of "complete" is not supported by the plain language of the APA or as a matter of common sense. *See RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.,* 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014) ("Because contract interpretation is an exercise in 'common sense' rather than 'formalistic literalism,' words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.") (quoting *Duane Reade, Inc. v. Cardtronics, LP,* 54 A.D.3d 137, 863 N.Y.S.2d 14, 19 (1st Dep't 2008)); *Progress Bulk Carriers v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.,* 939 F. Supp. 2d 422, 428–29 (S.D.N.Y. 2013) ("The presumption in commercial contracts is that the parties were trying to accomplish something rational."); *see, e.g., Palmieri v. Allstate Ins. Co.,* 445 F.3d 179, 191 (2d Cir. 2006) (Sotomayor, J.).

First, Luxco's interpretation of "complete" contradicts and renders meaningless other parts of the APA. *See Process Am., Inc. v. Cynergy Holdings, LLC,* 839 F.3d 125, 133 (2d Cir. 2016) ("An interpretation of a contract that has the effect of rendering at least one clause

superfluous or meaningless is not preferred and will be avoided if possible.") (citation omitted); *Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 493 (1st Dep't 2009) ("a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect."). Specifically, in Section 3.20 – as cited in full above – the parties expressly disclaimed any and all other representations and warranties not expressed in the APA. Luxco's attempt to inject a new representation or warranty thus contradicts the clear language and intent of Section 3.20. Further, Luxco's reading of "complete" contradicts and renders meaningless the APA's integration clause, Section 10.6, which unequivocally states that "[t]his Agreement (including the Exhibits and Schedules hereto) and the Ancillary Documents, when executed and delivered, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and thereof." Moreover, Luxco's argument that Beam had a duty to disclose what drives or impacts its financial statements on the face of Schedule 3.14 echoes Luxco's arguments about Beam's duty to disclose information during the due diligence period – and it is uncontested that the APA does not contain a warranty concerning the failure to disclose material facts or misstatements. (11/29 Trial Tr. at 326, 352 (Bratcher); 11/29 Trial Tr. at 392 (Lee).)

Second, Luxco's interpretation of "complete" belies common sense, especially because Luxco and Beam are sophisticated commercial parties that were represented by top-notch law firms during the APA's negotiations and drafting, as well as during the present litigation. Under New York law, "[s]ophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties." *DynCorp v. GTE Corp.,* 215 F. Supp. 2d 308, 322

(S.D.N.Y. 2002). Luxco's interpretation of "complete" asks the Court to add an additional obligation that is not expressed in the plain language of the APA and "[i]t is not the role of the courts to relieve sophisticated parties from detailed, bargained-for contractual provisions that allocate risks between them, and to provide extra-contractual rights or obligations for one side or the other." *Id.* Put differently, interpreting "complete" as Luxco suggests would add terms to the contract "under the guise of interpreting the writing." *See In re World Trade Ctr. Disaster Site Litig.,* 754 F.3d 114, 123 (2d Cir. 2014) (New York "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (quotation marks and citation omitted).

Moreover, construing "complete" to include the additional obligation of disclosing information that "drives" or "impacts" Beam's financial reports is commercially unreasonable. *See RCJV Holdings,* 18 F. Supp. 3d at 545 ("[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (quoting *In re Lipper Holdings, LLC,* 1 A.D.3d 170, 766 N.Y.S.2d 561, 562 (1st Dep't 2003)); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015) ("It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical."). Luxco, for example, argues that Beam should have disclosed certain factors on the face of Schedule 3.14 that are not readily quantifiable or available to Beam, such as the details on how distributors use entity grants to fund price supports. As Beam's former Vice President of Strategy and Corporate Development John Lee testified, Beam's financial systems do not provide details on how distributors use entity grant funds due to the distributors controlling how these funds are used. (11/29, Trial Tr. at 379-

26

80 (Lee) ("we do not track ... systematically ... how those entity funds are ultimately used by the distributors.").)  Likewise, because the distributors funded the LMFs in relation to the Acquired Brands, these LMFs were accounted for in the distributors' financial statements – not Beam's financial statements.  (11/29 Trial Tr. at 323-24 (Bratcher); 11/30 Trial Tr. at 525-26 (Jones).) Accordingly, Luxco's argument that Beam should have supplied information about another company's financial data on the face of Schedule 3.14 is commercially unreasonable.[3]

On a final note, the case law upon which Luxco relies to support its argument is of no moment because Luxco has failed to establish that the data and information that Beam relied upon affected the Net Sales and Shipped Cases numbers on Schedule 3.14 in the first instance. *See, e.g., E*TRADE Fin. Corp. v. Deutsche Bank AG,* 631 F. Supp. 2d 313, 377 (S.D.N.Y. 2009) ("Deutsche Bank breached § 3.14 of the SPA by failing to timely file tax returns from 1999 to 2002 that were true, correct, and complete in all material respects because these tax returns failed to deduct $27 million for the Servicing Fee Expenses."); *In re B & M Linen Corp.,* No. 12 C 11560 (ALG), 2013 WL 3579340, at *5 (Bankr. S.D.N.Y. July 12, 2013) ("there is no real issue that the [seller] significantly understated the costs of natural gas required to lawfully operate the laundry business during the due diligence period.").

In summary, Luxco has not establish by a preponderance of the evidence that Beam breached the parties' express warranty in Section 3.14 of the parties' APA.

---

[3]  Because Luxco's interpretation of "complete" is unreasonable and there is no ambiguity in relation to the term "complete," the Court need not consider extrinsic evidence to ascertain the parties' intent.  *See In re Lehman Bros. Holdings Inc.,* 761 F.3d 303, 309 (2d Cir. 2014) ("Ambiguity exists only if a contract term 'is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'") (citation omitted).

## II.     Luxco Breached the Transition Services Agreement

Furthermore, Luxco argues that Beam's breach of the express warranty in Section 3.14 of the APA excuses Luxco's performance under the TSA because the contracts should be construed together.  In particular, Luxco argues that it need not pay the amount due under the TSA because "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Merrill Lynch,* 500 F.3d at 186.  Because Luxco has failed to carry its burden that Beam breached Section 3.14 of the APA – which is Luxco's only defense to Beam's breach of contract counterclaim – Beam is entitled to judgment on its counterclaim. Here, it is undisputed that Luxco owes Beam $393,215 as the "True-Up" amount pursuant to the TSA.  In addition, under New York law, prejudgment interest is recoverable as a matter of right for a successful breach of contract claim.  *See Terwilliger v. Terwilliger*, 206 F.3d 240, 249 (2d Cir. 2000); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.,* 826 F. Supp. 2d 619, 630 (S.D.N.Y. 2011); N.Y. McKinney's C.P.L.R §§ 5001, 5002.

In short, because Luxco has failed to establish by a preponderance of the evidence that Beam breached Section 3.14 of the APA, Beam is entitled to judgment, costs, and prejudgment interest as to its breach of contract counterclaim in relation to the parties' TSA.

## CONCLUSION

For these reasons, Luxco has not established by a preponderance of the evidence that Beam breached the parties' express warranty in Section 3.14 of the parties' APA, as such, Luxco's performance under the parties' TSA is not excused and Beam is entitled to judgment, costs, and prejudgment interest for Luxco's breach of the TSA.

**Dated:** January 30, 2017

**ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**